JOHNSTON *v.* MANHATTAN RY. Co. *et al.*

*(Supreme Court, General Term, First Department.   June 12, 1891.)*

1. EMINENT DOMAIN—COMPENSATION—LOSS OF RENTS.

Where the rental value of property has been depreciated by the construction of an elevated railroad in the street on which such property abuts, the owner may recover the amount of rents so lost from the railroad company, though the property was in possession of tenants.

2. SAME—EXPERT TESTIMONY.

In such case, a witness who testifies that he is in the real-estate business, and has followed the sales and rental values in the neighborhood of plaintiff's property for 20 years or more, is competent to give his opinion as to the extent of the depreciation.

3. SAME—EXAMINATION OF WITNESS.

In such case, a witness who testified that he owned and occupied a building in the street in question when the elevated road was built, was asked what effect the construction of the elevated railroad had on his property, to which he replied, "It destroyed my business entirely." *Held,* that such answer was responsive to the question.

Appeal from judgment on report of referee.

Action by Walter L. Johnson, as receiver, etc., against the Manhattan Railway Company and the New York Elevated Railroad Company. The testimony of the witness Thompson as to his knowledge of real estate in the vicinity of plaintiff's property was as follows: "I am in the real-estate business, and have been for three or four years. Before that I had charge of and owned real estate in the city of New York. I also appraised real estate in the city of New York, and rented and sold real estate. I am acquainted with the building No. 166 Pearl street, and with that neighborhood. I have followed the sales and rental values in that neighborhood since 1866, and am acquainted with a good many of the sales that have taken place there, and the rental values of different buildings in that neighborhood during that period. I have had charge of the renting of the building adjoining this, No. 166 Pearl street, since 1866. I have had charge of the renting of that building during all that period. I have examined No. 166 Pearl street. I know it well. It is in size a similar building to mine, No. 168, next door; otherwise not. It has the same frontage on Pearl street." The material portion of the testimony of the witness Wenman is as follows: "My business is that of a cotton broker. I have been a cotton broker for forty-nine years. I carried on business from, say, 1865, up to 1884, at 146 Pearl street, the building in suit. I purchased that building in 1865 for $40,000. I made some changes in the building at the expense of $12,000. I put in a new front, and lowered the floors, and improved the property. I occupied it myself in my business as cotton broker from the time I bought it up to 1884. (Letter was handed witness, and asked if his recollection was so refreshed by that that he could state what he had sold that property for.) I sold it to the bank in liquidation of an indebtedness of $41,500. That was in 1884, the 1st of May. * * * I have been acquainted with Pearl street and its occupation all the time that I owned this property, and up to the present time, and the occupation of Water street in that vicinity, and also of Beaver street; and I have a general knowledge of the business that was congregated in these different streets prior to the elevated railroad. It was once a silk mart of New York; afterwards, crockery, tobacco, and cotton; dry goods also. I am acquainted with Pearl street to-day. Prior to the elevated railroad, Water street in this vicinity was inferior to Pearl street; also Beaver street. To-day they are superior to Pearl street as a business street. My office is there at 113 Pearl street, on Hanover square. It is about 100 feet from the elevated railroad station. *Question.* Please describe Pearl street during the time sued for, from 1884 to March 12, 1889,—what kind of a street it was after the railroad came in the street, as regards business. *Answer.* The character of the business changed.

*Q.* Specify in what way. *A.* It drove the leading merchants out of the street, and it brought small offices there. (Counsel for the defendants moved to strike out the answer of the witness as not responsive, and as stating a conclusion of the witness as to the effect of the railroad upon individuals. The referees denied the motion, and counsel for defendants duly excepted.) I was occupying that building when the elevated railroad came there. I left the building in 1884. The consideration, $8,000, mentioned in the deed of this property to James D. Fish, was not the true consideration. The true consideration was what I have already testified to. *Q.* What effects, if any, did you observe from the construction and operation of the elevated railroad in front of that property?. *A.* It destroyed my business entirely." Defendants appeal.

Argued before VAN BRUNT, P. J., and LAWRENCE and DANIELS, JJ.

*Davies & Rapallo,* for appellants. *John A. Weekes, Jr.,* for respondent.

DANIELS, J. The plaintiff was appointed receiver of the property and assets of the Marine National Bank of the City of New York by the comptroller of the currency of the United States; and he brought this action to recover the damages caused by the elevated railway to premises known as "166," on the southerly side of Pearl street, in the city of New York. They were conveyed in trust to James D. Fish, the president of the bank, on the 26th of September, 1882, and were conveyed to the receiver by his general assignee, in February, 1885, and finally sold by the receiver in the early part of the spring of 1889. The elevated railway was constructed through the part of Pearl street upon which the premises were situated as early as 1878, and it was afterwards used by the defendants for the passage of its railway trains. The structure extended above and nearly across the street, between the sidewalks, and in front of the building, which was four stories in height, situated upon and forming part of the premises. The occupancy and use of the building were diminished in value by the noise, smoke, and cinders from the trains passing along the railway, and the interruption and disturbance of the light which would otherwise have been uniformly received by the premises. On this account it was alleged that their rental value had been materially reduced from the 21st day of October, 1883, to the 30th of March, 1889, which was the period for which the plaintiff was allowed to recover by the judgment which has been entered. The action was referred to three referees, and two of them joined in the report, assessing the plaintiff's damages at the sum of $3,109.15. This allowance of damages has been objected to as excessive. But evidence was given, which was accepted as credible by the referees, tending to prove that the rental value of the premises had been materially reduced by the elevated railway structure, and the use made of it in the passage of the defendants' railway trains; and by a stipulation made on the trial the referees were permitted to inspect the premises for themselves, and act upon the observations made by them as a part of the proof in the action; and that they did inspect the premises is a fact stated in their report, and it was founded as well on that inspection as on the evidence given by the witnesses upon the trial. What degree of dependence was placed upon their own observations of the locality, and how much upon the evidence of the witnesses, the case does not disclose; and it cannot, therefore, be determined on this appeal that the conclusion reached as to the amount of the damages was for any cause erroneous. What the damages were allowed for was the diminished rental value and loss of rent for the period of five years and five months, and it cannot be said that this was an excessive amount. This was produced by the structure and the use to which it was devoted, and not by any loss arising from the failure of the tenant to pay the rent he covenanted to pay under the lease by which the premises were demised. That appears by the report, and the effect of the structure and its use upon the premises, and for which alone the damages were awarded. It was to the loss occasioned by

these causes that the recovery was directed; and it seems to have been within the rule maintained by the authorities. *Francis* v. *Schoellkopf*, 53 N. Y. 152; *Hussner* v. *Railroad Co.*, 114 N. Y. 433, 21 N. E. Rep. 1002. During most of the time when these damages accrued the premises were occupied by tenants, and that has been urged as an obstacle standing in the way of their recovery. But the loss sustained from these causes by the owners of property fronting upon streets devoted in part to the structure and trains of the elevated railway company has in other cases been allowed to be recovered, where it has arisen out of the reduced rental value of real estate, and this case seems to be within the rule which these authorities sustain. By means of these causes, the owner is prevented from obtaining the amount of revenue he would otherwise obtain from his property; and no sound principle seems to stand in the way of the recovery of this difference. The cause of the loss is directly traceable to the acts of the defendants. By reason of it the owner was obliged to lease his property for smaller returns than he would have otherwise obtained. The cause of the difference is the wrong of the defendants, and against that the law should afford him reasonable indemnity. It does so in other cases of losses created by the wrongful acts of others, and the defendants should be held to the same measure of accountability for wrongs of this description.

The witness Thompson was sufficiently conversant with the sales and values of real estate to be allowed to express his judgment on that subject. His experience had extended through many years in that vicinity, and his business required the devotion of his attention in that direction. The referees were therefore entirely right in receiving his estimates of values and rentals, (*Oties* v. *Smelting, etc., Co.*, 7 N. Y. Supp. 251;) and, beyond that, the answers received, and now pressed as improper, do not appear to relate to this particular parcel of land. The answer given by the witness Wenman, that the elevated railroad had destroyed his business, was responsive to the question which without objection he was allowed to answer, and so was his answer that it drove the leading merchants out of Pearl street, and brought small offices there; and whether the referees should strike them out when the defendants requested that to be done was a matter of discretion with them, the refusal to exercise which cannot be assigned for error. *Marks* v. *King*, 64 N. Y. 628; *Pontius* v. *People*, 82 N. Y. 340, 347; *In re Morgan*, 104 N. Y. 75, 85, 86, 9 N. E. Rep. 861. The answers also were without any materiality to the case. It could have no effect upon any point in it that the business of the witness had been destroyed, or that the leading merchants had been driven from the street. The question here was the effect of the railway and its use upon this particular building, which these answers did not apply to; and the report of the referees demonstrates the fact that it was in no respect influenced by this evidence, for it proceeded wholly upon the effect of the structure itself, and the use made of it by the defendants' engines and trains. The defendants were not, therefore, injured in the least by these answers. No other objections have been urged as reasons for disturbing this judgment, and none of any merit are contained in the case. The judgment, therefore, should be affirmed. All concur.